UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Claudia Gayle, individually and on behalf
of all others similarly situated as a class
representative,

                    Plaintiff,              CV-07-4672(CPS)(MDG)

     - against -                            MEMORANDUM
                                            AND ORDER
Harry's Nurses Registry, Inc., and Harry
Dorvilier a/k/a Harry Dorvilien.

                    Defendants.

----------------------------------------X

SIFTON, Senior Judge.

     Plaintiff Claudia Gayle, individually and on behalf of all

others similarly situated, commenced this purported collective

and class action on November 7, 2007, alleging that Harry's

Nurses Registry, Inc. ("Harry's Nurses") and its principal, Harry

Dorvilier ("Dorvilier"), (collectively "defendants") violated

provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et

seq*. ("FLSA") and the New York Minimum Wage Act, N.Y. Labor Law

§§ 190 *et seq*. and 650 *et seq*. ("MWA") by failing to pay overtime

wages.[1] Plaintiff seeks overtime premium pay, liquidated damages,

reimbursement for amounts withheld from pay as workers'

compensation, pre-judgment interest, a permanent injunction,

certification of this action as a class action, costs, and

attorneys' fees. Now before the Court is the defendants' motion

---

[1]In her complaint, plaintiff also made a claim under N.Y. Labor Law §
193, alleging that defendants had deducted the cost of workers' compensation
insurance coverage. Plaintiff has withdrawn this claim.

- 2 -

for summary judgment, the plaintiff's cross-motion for partial
summary judgment on the issue of liability, and the plaintiff's
motion to distribute notice to potential class members. The
motion also effectively asks the Court to decide whether
plaintiff's action may be maintained as a collective action under
the FLSA. For the reasons set forth below, the defendants' motion
is denied and the plaintiff's motions are granted.


## BACKGROUND

The following facts are taken from the complaint and the
parties' submissions in connection with this motion. The facts
are undisputed except as noted.


*Structure of Harry's Nurses*

Harry's Nurses is a corporation organized under the laws of
the State of New York, and has its principal place of business in
Queens, New York. Dorvilier is the president and chief executive
officer. Plaintiff is a registered nurse and resides in Nassau
County, New York.

Harry's Nurses refers temporary healthcare personnel,
including Registered Nurses ("RNs") and Licensed Practical Nurses
("LPNs") (collectively, "field nurses") to patients in their
private homes in and around New York City. Affidavit of Harry
Dorvilier at ¶ 5 ("Dorvilier Aff."). This is Harry's Nurses' only

- 3 -

business. Deposition of Harry Dorvilier at 9:16-10:22 ("Dorvilier Dep."). Harry's Nurses has from seven to ten full-time employees, who hold the offices of director of patient services, office manager, accountant, field nurse staffer, homecare nurse staffer, staff coordinator, billing/payroll clerk, and nursing supervisor. Dorvilier Aff. at ¶ 58.

Harry's Nurses maintains a referral list or "registry" of field nurses. *Id*. at ¶ 6. At any given time, Harry's Nurses may have as many as five hundred field nurses on its referral list. *Id*. at ¶ 7. In order to be listed on the referral list, a nurse must fill out an application, sit for an interview, consent to a background check, provide documentation that she or he is covered by his or her own liability insurance, possess a valid LPN or RN license, read Harry's Nurses orientation information, and complete a test of basic nursing knowledge. *Id*. at ¶ 8. Harry's Nurses provides the field nurses with an in-service document pertaining to various basic procedures including emergency and disaster planning, treating a patient with Alzheimer's Disease, the stages of dying, New York State laws regarding proxy decision making power, and hepatitis/HIV information and confidentiality. *Id*. at ¶ 10. Nurses must certify that they have read and understood this document, which has a blank line for "employee's signature." *Id*. at 32:22-25, 34:15-20. When field nurses care for patients, they are expected to perform twelve categories of

- 4 -

assessments, each category being described with particularity in the documents issued by defendants, and to note their findings in the patient's chart. *Id*. at 125:23-126:19.

Patients typically come into contact with Harry's Nurses via advertising on the radio and in newspapers, and advertising directed towards social workers and doctors. Dorvilier Dep. at 14:9-18:2. When a client contacts Harry's Nurses seeking a nurse placement, Harry's Nurses generates a pool of field nurses from the referral list whose qualifications it determines best coincide with the needs of the patient. Dorvilier Aff. at ¶ 11. The Nursing Supervisor calls the nurse from the pool to inform her of the placement opportunity, including the hours and number of days of the placement. *Id*. at ¶ 12. The details of the nursing services to be rendered are determined by the patient's needs and condition. *Id*. at ¶ 18. If a patient is unhappy with the nurse, the patient may contact Harry's Nurses and ask for a replacement. *Id*. at ¶ 30. Field nurses have no contractual or economic relationships with patients to whom they are referred through Harry's Nurses. P. Ex. B at 2.

Field nurses on the referral list are not discouraged from holding other jobs. Dorvilier Aff. at ¶ 19-20. Many nurses on the referral list wait days, weeks, or months between placements. *Id*. at ¶ 26. The nurses commonly work at one or several other jobs, including putting their names on other referral lists. *Id*. at ¶

- 5 -

27. Defendants require that field nurses arrange their schedules
to avoid conflicts with assignments from Harry's Nurses.
Dorvilier Dep. at 110:13-111:12. In the case of a conflict, a
nurse may not send another nurse in his or her stead. *Id*. at
40:18-41:13. A nurse is under no obligation to accept a work
placement and may decline at her discretion, without suffering
negatively with respect to future placement opportunities. *Id*. at
¶ 13-14. A nurse must work a full shift rather than a portion of
a shift. Dorvilier Dep. at 74:3-75:12.

Within 90 days of the time that a nurse is placed in service
by Harry's Nurses, a nursing supervisor goes to the patient's
home. *Id*. at ¶ 2. Affidavit of Cherriline Williams-West at ¶ 1
("Williams-West Aff.").  The supervisor observes and assesses the
nurse's skills, including hand washing. *Id*. She also checks the
book of doctor's orders relating to the patient to ensure that
the orders regarding medication and dosage are up-to-date. *Id*.
The supervisor or one of her colleagues performs an assessment
within 48 hours of the time that Harry's Nurses begins to care
for a patient. *Id*. Harry's nursing coordinator phones the patient
at least once per day to verify that the assigned nurse has
reported for duty. *Id*. at 68:19-70:11.

Nursing supervisors are responsible for reviewing
assessments performed by nurses in the field. Williams-West Aff.
at ¶ 3. Nursing supervisors conduct monthly reviews with the

- 6 -

nurses in the field that last 4-5 hours, for which the nurses are not paid. *Id*; Dorvilier Aff. at 85:2-86:4. Nurses are taught how to perform a proper head-to-toe assessment of the patient, including such things as mental capacity, heart rate, condition of tracheotomy, and sound of the lungs. *Id*. The supervisor also talks to the nurses about infection control and legal issues in nursing. *Id*. On occasion, supervisors are accompanied on the in-the-field assessments by vendors of medical equipment or their technicians to assist the supervisor in instructing the nurses on the use of medical equipment. *Id*.

The nursing supervisor reports to the nursing director.[2] Dorvilier Dep. at 28:18-20. The nursing director creates a progress notes form, which must be completed by the nurse and submitted with her time sheet. If any note is "not in compliance," the nursing supervisor directs the nurse to rewrite the note or attend an in-service continuing education session. *Id*. at 26:25-30:12. After the time sheets and progress notes are turned in, Harry's Nurses pays the nurses a set hourly rate for hours worked. Dorvilier Aff. at ¶ 48.

Approximately 95% of Harry's Nurses' placements are for the care and treatment of Medicaid patients. *Id*. at ¶ 46. Harry's Nurses follows Medicaid's rules and regulations in all of its

---

[2]The current nursing director is Dorvilier's sister. Dorvilier Dep. at 28:6-13.

- 7 -

business activities. *Id.* at ¶ 46. Harry's Nurses submits the
nurses' time sheets and progress notes to Medicaid on a bi-weekly
basis, after which Medicaid pays Harry's Nurses a "reimbursement
rate" for the hours worked by field nurses on Medicaid cases.
*Id.* at ¶ 49. The reimbursement rate for LPNs is currently a fixed
rate of $24.00 an hour, regardless of overtime hours worked. *Id.*
at ¶ 52. Harry's Nurses pays LPNs the reimbursement rate less
$5.00 per hour for Harry's Nurses' expenses and profit. *Id.* at ¶
51.

All field nurses on the referral list are required to carry
their own professional liability insurance and each individual
nurse is responsible for maintaining his or her professional
license. *Id.* at ¶ 55. Nurses must furnish and maintain their own
basic supplies, including a blood pressure meter and stethoscope.
*Id.* at ¶ 57. Nurses must also purchase their own uniforms and pay
for their own travel expenses. *Id.* at ¶ 57.

Field nurses have no investment in defendants' business.
Dorvilier Dep. at 43:13-15. A nurse cannot lose money providing
services to patients and cannot profit beyond the hourly fee
paid. *Id.* at 43:16-45:13. Harry's Nurses takes charge of billing
and collections from the field nurses' patients' insurance
carriers; Harry's Nurses pays its nurses promptly regardless of
whether the carriers pay promptly. *Id.* 118:21-120:9. Field nurses
are covered by Harry's Nurses' commercial liability insurance

- 8 -

policy. *Id*. at 118:14-20.

Defendants may unilaterally end their association with a field nurse. Dorvilier Dep. at 109:22-110:12. If they do so, they owe the nurse for hours actually worked, but do not owe contract damages. *Id*. The "Confidentiality of Patient" form generated by defendants states that "[f]ailure to maintain patient confidentiality may lead to discharge." *Id*. at 108:14-25; P. Ex. P. Nurses applying for a position on the registry acknowledge their understanding that false information on the application may result in discharge. P. Ex. D. at 4. A discharged nurse may not seek employment directly from her patient. P. Ex. H. Other reasons for which a nurse may be discharged include failure to appear for work punctually and at the request of the patient. Dorvilier Dep. at 23:19-24:1, 108:14-25.

*Plaintiff's Work Situation*

On February 20, 2007, plaintiff entered into a "Memorandum of Agreement" with Harry's Nurses, whereby she agreed to retain Harry's Nurses' services to coordinate placement opportunities. Dorvilier Aff. ¶ 65. Plaintiff's relationship with Harry's Nurses lasted for nine months, until November, 2007. *Id*. at ¶ 70. Plaintiff agreed that she would be responsible for payment of income taxes for the work performed and that she would carry her own professional liability insurance. *Id*. Harry's Nurses did not

deduct any federal or state income taxes on her behalf. *Id.* at ¶ 75. Defendants treated plaintiff as an independent contractor. Gayle Aff. at ¶ 3.

Plaintiff and her similarly situated co-workers regularly worked in excess of 40 hours in the work week, and were not paid overtime premium pay for this work. Complaint at ¶ 19 ("Compl."); Dorvilier Dep. at 75:13-19, 87:8-13. Defendants state that plaintiff never demanded overtime pay. Dorvilier Aff. at ¶ 76.

Defendants paid plaintiff directly for her services; plaintiff formed no corporation or other business entity. Affidavit of Claudia Gayle at ¶ 5 ("Gayle Aff."). She has no business cards, has never advertised, and has never solicited a patient directly. *Id.* at ¶ 4. She is dependent on referrals from Harry's Nurses and other registries. *Id.*

## DISCUSSION

### I. Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

- 10 -

574, 587 (1986).

The party seeking summary judgment has the burden of
demonstrating that no genuine issue of material fact exists.
*Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In
order to defeat such a motion, the non-moving party must raise a
genuine issue of material fact. "An issue of fact is genuine if
the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill.
of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material
when it "might affect the outcome of the suit under the governing
law." *Id*. Although all facts and inferences therefrom are to be
construed in the light most favorable to the non-moving party,
the non-moving party must raise more than a "metaphysical doubt"
as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen
Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001).
The non-moving party may not rely on conclusory allegations or
unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health &
Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving
party must produce more than a scintilla of admissible evidence
that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities
Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power
Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In
deciding such a motion the trial court must determine whether
"after resolving all ambiguities and drawing all inferences in

- 11 -

favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

## II. Employment Status

In their motion for summary judgment, defendants claim that plaintiff was an independent contractor, not subject to the FLSA.

## A. The FLSA Economic Reality Test

The overtime provision of the FLSA states that "no employer shall employ any of his employees... for a workweek longer than 40 hours" unless the employee receives overtime pay. 29 U.S.C. § 207(a)(1). The FLSA's definition of an employee "is necessarily a broad one in accordance with the remedial purposes of the Act." *Brock v. Superior Care*, 840 F.2d 1054, 1058 (2d Cir. 1988) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363, L. Ed. 301, 65 S. Ct. 295 (1945)). "Employee" refers to "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" means "to suffer or permit to work." *Id*. § 203(g). The second circuit has treated employment for FLSA purposes "as a flexible concept to be determined by a case-by-case review of the totality of the circumstances." *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008). "Several factors are relevant in determining whether individuals are 'employees' or

- 12 -

independent contractors for purposes of the FLSA." *Superior Care*,
840 F.2d at 1058. These factors are known as the "economic
reality test," and include the following: "(1) the degree of
control exercised by the employer over the workers; (2) the
workers' opportunity for profit or loss and their investment in
the business; (3) the degree of skill and independent initiative
required to perform the work; (4) the permanence or duration of
the working relationship; and (5) the extent to which the work is
an integral part of the employer's business."[3] *Id*. at 1058-59
(citing *United States v. Silk*, 331 U.S. 704, 716, 91 L. Ed. 157,
67 S. Ct. 1463 (1947). "No one of these factors is dispositive;
rather, the test is based on a totality of the circumstances."
*Id*. at 1059. "Any mechanical application of the test is to be
avoided." *Id*. The ultimate concern is whether the worker is in
business for herself. *See id*. Where work done in its essence

---

[3]     Defendants acknowledge the applicability of the economic realities
test, but contend that in addition to this test, the Internal Revenue Service
has utilized a more expansive set of twenty-four factors to aid in its
determination as to whether a person should be considered an independent
contractor or an employee. Defendants' Memorandum of Law in Support of Summary
Judgment at 13 ("Def. Mem."). Defendants claim that these factors are helpful
in "narrowing the scope" of the six factors named above. *Id*. Plaintiff
responds that the IRS test is not applicable, citing the Supreme Court's
decision in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S. Ct.
1344; 117 L. Ed. 2d 581 (1992) (the FLSA definition of 'employee' "stretches
the meaning of 'employee' to cover some parties who might not qualify as such
under a strict application of traditional agency law principles.") Accord
*Frankel v. Bally Inc.*, 987 F.2d 86, 89 (2d Cir. 1993). Plaintiff cites
numerous cases that apply the six factor economic realities test, rather than
the IRS test. *See Ling Nan Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 67 (2d
Cir. 2003); *Schwind v. EW Assocs.*, 357 F.Supp.2d 691, 700 (S.D.N.Y. 2005)
("[t]he Supreme Court has specifically declined to apply the well-established
agency law concepts of 'employee' and 'independent contractor' when
interpreting congressional labor statutes"). In light of these precedents, I
apply the six-factor test.

- 13 -

follows usual path of employee, affixing an 'independent contractor' label does not remove the worker from the protection of Fair Labor Standards Act. *Rutherford Food Corp. v McComb* 331 US 722, 91 L Ed 1772, 67 S Ct 1473 (1947).

In *Superior Care*, the Second Circuit found that a registered nurse was an employee within the meaning of the FLSA. The defendant in *Superior Care* was engaged in the business of referring temporary healthcare personnel, including nurses, to individual patients. 840 F.2d at 1057. Nurses wishing to work for Superior Care were interviewed and placed on a roster. *Id*. At 1057. As work opportunities became available, the company would assign nurses from the referral list. *Id*. Nurses were not required to accept any proposed referral. *Id*. Once an assignment was accepted, the treatment was prescribed by the patient's doctor. *Id*. The company supervised its nurses through visits to job sites once or twice a month. *Id*. Nurses were required to submit patient care notes to comply with state and federal law. *Id*. The length of an assignment depended on the needs of the patient. *Id*. The nurses were prohibited from entering into private arrangements with patients. *Id*. The nurses were paid an hourly wage. *Id*. Nurses were permitted to hold other jobs, and many were listed on other nurse registries. *Id*. Many of the nurses worked for Superior Care for less than a year, and employment placements were sporadic. *Id*. The one difference of

- 14 -

note between this case and *Superior Care* was that some of the nurses in *Superior Care* were classified as employees, for whom the employer paid taxes. *Id*. At 1059. However, the Court did not rely on this factor to determine that Superior Care owed back wages to the nurses it had classified as independent contractors. *Id*. The Court applied the economic reality factors and determined that they fully supported the District Court's conclusion that the nurses were employees. *Id*. The facts of the case before me differ in no material respect from those of *Superior Care*. I apply the economic reality factors below in order to determine whether plaintiff must be deemed an employee entitled to overtime.


*1. Degree of Control Exercised by Defendants*

In *Carter v. Dutchess Comm. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984), the Second Circuit stated that the following factors should be used to determine whether an entity has exercised formal control over its workers: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."[4] (cited in *Barfield*, 537 F.3d

---

[4]The Second Circuit has also stated that an entity that lacks formal control over workers may nevertheless be considered their employer based on its exercise of functional control. *Zheng v. Liberty Apparel Company*, 355 F.3d

at 142-43). Applying these factors to the plaintiff, I find that
defendants exercised control over plaintiff. Defendants had the
power to end their association with plaintiff unilaterally for
failure to maintain patient confidentiality or for providing
false information on the application, as well as other reasons.
If she is fired, plaintiff would be unable to contact clients
directly to continue working for them. Plaintiff was required to
create progress notes, which were scrutinized every two weeks.
Plaintiff's work was supervised by a nursing supervisor who spent
4-5 hours per month with her in the field. Plaintiff had no
economic relationship with their patients, nor could she
negotiate her rate of pay with them. Defendants set the rate of
pay for plaintiff based on the Medicaid reimbursement rate less
Harry's Nurses' expenses and profit. Plaintiff was not permitted
to assign her shift to others. Plaintiff was free to accept or
reject shifts, but she did accept a placement, she was required
to perform for the entire duration of the placement rather than a
portion.

In *Superior Care*, the Court stated that Superior care

_____

61 (2d Cir. 2003). *Zheng* lists the following six factors: "(1) whether
[defendant's] premises and equipment were used for the [plaintiff's] work; (2)
whether the [plaintiff] had a business that could or did shift as a unit from
one putative joint employer to another; (3) the extent to which [plaintiff]
performed a discrete [job] that was integral to [defendant's business]; (4)
whether responsibility under the contracts could pass from one [nurse] to
another without material changes; (5) the degree to which the [defendants] or
their agents supervised [plaintiff's] work; and (6) whether [plaintiff] worked
exclusively or predominantly for [defendants]." *Id.* at 72. Because I conclude
that defendants exercised formal control over plaintiff, it is not necessary
to analyze her work situation under the functional control test.

- 16 -

exercised control over its nurses, because it unilaterally
dictated the nurses' hourly wage, supervised the nurses by
monitoring their patient care notes and visiting the job sites,
and limited work hours to 40 hours per week where nurses claimed
they were owed overtime. 840 F.2d at 1060. Although the
supervisor made job site visits only once or twice a month, the
nurses were well aware that they were subject to such checks as
well as to regular review of their nursing notes. *Id*. The Court
noted that "[a]n employer does not need to look over his workers'
shoulders every day in order to exercise control." *Id*. Control
may be restricted or exercised only occasionally without removing
the employment relationship from the protections of the FLSA. *See
Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999).

Defendants make a number of arguments against a conclusion
that they exercised control over plaintiff, none of which are
persuasive. Defendants state that plaintiff signed a document
during her initial interview indicating that she was retaining
Harry's Nurses to coordinate placement opportunities for her as
an independent contractor. The fact that plaintiff signed a form
describing her as an independent contractor does not make her an
independent contractor; the economic realities test assesses the
realities of the work situation rather than job titles.

Defendants maintain that the patients and their families and
doctors were the ones who dictated the instructions for care.

- 17 -

This claim is belied by the affidavit of Ms. Williams-West, a nursing supervisor for Harry's Nurses who attests that she did supervise the field nurses' work.[5] Defendants further claim that the patients alone possess the power to fire the nurses.[6] This claim is contradicted by the fact that Harry's Nurses explicitly reserves the power to unilaterally fire nurses for a number of reasons, *e.g.*, failing to comply with confidentiality requirements.

Defendants claim that progress notes are necessary in order to be in compliance with Medicaid standards, and they are not collected for the purpose of monitoring nurses. *Id.* at ¶ 45. Defendants state that because they have no intention of monitoring nurses for their own purposes, this exercise of control should not be significant for the purpose of determining employee status under the FLSA. Assuming this claim were true, the fact that defendants do not profess an interest in monitoring

---

[5]Defendants previously maintained that no one from Harry's Nurses ever observed or evaluated plaintiff's performance in carrying out her nursing duties. Def. Mem. at 25. Plaintiff then offered the affidavit of Ms. Williams-West, a former nurse supervisor with Harry's Nurses, which stated that, once a month, Ms. Williams-West would visit nurses in the field and review certain procedures with them in order to ensure that they were being properly performed. Defendants thereafter explicitly admitted that Harry's Nurses supervises the nurses once a month. Defendants' Reply to Plaintiff's Cross-Motion for Summary Judgment at 3 ("D. Reply"). However, defendants continue to maintain that Harry's Nurses has "no stake in patient 'progress' beyond maintaining its contractual relationship with the client's insurance provider." *Id.*

[6]Defendants state that "Harry's does not discharge nurses; like any other subcontractor, the nurse will simply not be invited to work on future assignments." D. Reply at 4. This claim begs the question. If the nurses are employees, defendants' decision not to 'invite them back' constitutes a firing.

- 18 -

the nurses' work but require them to prepare paperwork in order
to comply with government regulations does not change the result,
which is is that defendants do supervise field nurses' work,
thereby enabling them to control that work. *See Barfield*, 537
F.3d at 147.

Defendants acknowledge that they maintained "functional
control over the nurses," but argue that the "ultimate arbiter of
formal control" was the patient, and therefore this factor cannot
weigh against defendants. D. Reply at 5. Defendants misconstrue
the law. An employee may be jointly employed where, *inter alia*,
two or more employers arrange to share the employee's services or
where one employer acts directly or indirectly in the interest of
another in relation to the employee. 29 C.F.R. § 791.2(b). The
fact that the patients may have exercised a good deal of control
over nurses does not lead to the conclusion that defendants did
not exercise such control.  Defendants cite *Barfield*, 537 F.3d at
146, for the proposition that because the patients have ultimate
control over various aspects of the work, they are the employers.
However, *Barfield* stands for the proposition that one joint
employer may not disclaim liability by arguing that another joint
employer exercises a greater degree of control. *Id*. at 141, 146.


*2. Plaintiff's Opportunity for Profit or Loss and her Investment
in the Business*

- 19 -

In his deposition, defendant Dorvilier noted that field nurses have no investment in the defendants' business, that nurses cannot lose money providing services, and that nurses cannot profit beyond the hourly fee paid. Dorvilier Dep. at 43:13-15; 43:16-45:13. Defendants now argue that plaintiff made a significant investment by purchasing and maintaining equipment (such as her stethoscope and nursing scrubs) and securing a means of transportation. Defendants argue that plaintiff was able to maximize profit by choosing how much equipment to purchase and what form of transportation to use, taking into account how many hours she worked. That plaintiff would 'profit' more if she had worked more hours does not mean that she had an opportunity for profit. Her pay was not contingent on the success of the company or the excellence of her work. She was paid an hourly wage. The argument that her stethoscope and nursing scrubs were an investment would render every worker who purchases basic clothing and tools for a job an independent contractor. Such investments are "negligible." *Superior Care*, 840 F.2d at 1059.


*3. Degree of Skill*

Plaintiff concedes that nurses are skilled workers. However, "the fact that workers are skilled is not itself indicative of independent contractor status. A variety of skilled workers who do not exercise significant initiative in locating work

- 20 -

opportunities have been held to be employees under the FLSA."
*Superior Care*, 840 F.2d at 1060. In this case, nothing in the
record indicates that plaintiff exercised initiative in finding
job assignments. "As a matter of economic reality, the
[plaintiff's] training does not weigh significantly in favor of
independent contractor status." *Id*.


*4. Permanence or Duration of the Working Relationship*

    Plaintiff worked for defendants for nine months. Defendants
state that plaintiff's relationship with Harry's Nurses was
irregular and unstructured, as there were no regular shifts or
typical number of hours work, and that the schedule for placement
was determined by the needs of the patient. In *Superior Care*, the
Court held that the transient nature of the nursing work force,
including seeking placement through referral services, was "not
dispositive of independent contractor status." 840 F.2d at 1060.
Employees may work for more than one employer without losing
their benefits under the FLSA. *Id*. Further, "workers have been
deemed employees where lack of permanence is due to operational
characteristics intrinsic to the industry rather than to the
workers' own business initiative." *Id*. at 1060-61. Following the
Second Circuit's holding, the irregular nature of plaintiff's
work for defendants is no bar to a finding that she was an

- 21 -

employee within the meaning of the FLSA.[7]


5. *Whether Plaintiff's Work is an Integral Part of Defendants'*
*Business*

　　Defendants' only business is to place nurses in homes to
provide patient care. Plaintiff performed this function. "The
services rendered by [plaintiff] constituted the most integral
part of [defendant's] business, which is to provide health care
personnel on request." *Superior Care*, 840 F.2d at 1059.
Nevertheless, defendants claim that the "actual services rendered
by plaintiff during placement for any particular client were not
an integral part of Harry's Nurses." Def. Mem. at 26. Defendants
argue that, had plaintiff declined to accept any of her placement
offers from defendants, defendants would have offered those
opportunities to other qualified nurses. The question is not
whether plaintiff's individual services were essential to the
business, but whether the type of work performed by plaintiff was
integral to the defendants' business, which it clearly was. *See*
*id*.


**B. Application of the Economic Realities Factors**

---

[7]Defendant cites an unreported case from a District Court in Tennessee,
which found that nurses who often worked less than 40 hours a week for a
referral service, simultaneously performed other nursing work, and worked only
those shifts to which they agreed in advance were a transient work force. *See*
*Wilson v. Guardian Angel Nursing, Inc.*, 2008 U.S. Dist. LEXIS 59623 (M.D.Tenn.
2008). This holding is contrary to the law in the Second Circuit.

- 22 -

Under the economic realities test, plaintiff is an employee
within the meaning of the FLSA. Defendants admit that they
exercise "functional control" over the nurses,[8] and other indicia
of control are present. Even taking defendants' claim as true
that they required nurses to submit progress notes and to be
supervised by the supervising nurse once a month only to comply
with government regulations and to ensure that the patients needs
were being met, the fact remains that defendants exercised
control over plaintiff's nursing activity by reviewing the notes
and training her once a month to ensure that she was complying
with proper nursing procedures. Plaintiff invested minimal funds
in the business, and had no opportunity for profit or loss.
Plaintiff is a skilled employee, but exercised no independent
initiative in locating work opportunities. Defendants do not
dispute this. Accepting as true defendants' claim that plaintiff
and her colleagues were a transient working population, this
factor does not weigh against her in the context of a field of
work where all employees are transient. *See Superior Care*, 840
F.2d at 1060. The Second Circuit has determined that work
performed by home healthcare workers for nursing referral
agencies is an integral part of the employer's business. *Id*. at
1059.

Accepting all of defendants' statements as true for the

[8]*See* Def. Mem. at 5.

- 23 -

purposes of this motion, no reasonable fact finder could find that plaintiff was not an employee under the FLSA. Each of the elements of plaintiff's work situation cited by defendants in support of their claim has been specifically addressed in prior case law, which has concluded that persons such as plaintiff are employees.

Under the FLSA, "no employer shall employ any of his employees... for a workweek longer than 40 hours" unless the employee receives overtime pay. 29 U.S.C. § 207(a)(1). Defendants have admitted that plaintiff was not paid overtime wages when she worked more than forty hours in one week, in violation of the FLSA. Plaintiff's motion for partial summary judgment on the question of liability is accordingly granted.


**III. Joint and Several Liability**

Plaintiff also seeks partial summary judgment on the question of liability against both Harry's Nurses and Mr. Dorvilier. Courts have found that the FLSA definition of "employer" includes individual principals of corporate employers. *RSR Security Servs.*, 172 F.3d at 139-40 (chairman who was 50% owner of corporate defendant, who had the power to hire and fire, was individually liable for overtime violations). "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an

- 24 -

employer along with the corporation, jointly and severally liability under the FLSA for unpaid wages." *Keun-Jae Moon v. Joon Gab Kwon*, 248 F. Supp. 2d 201, 237 (S.D.N.Y. 2002) (citing *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir. 1983) (citing cases)). *See also Samborski v. Linear Abatement Corp.*, 1999 U.S. Dist. LEXIS 14571 (S.D.N.Y. 1999) (president and sole owner of company had operational control and was individually liable); *Chao v. Vidtape, Inc.*, 196 F.Supp.2d 281 (E.D.N.Y. 2002) (president had power to hire, fire, supervise, and determine pay rate and was individually liable); *Lopez v. Silverman*, 14 F.Supp.2d 405, 412-13 (S.D.N.Y. 1998) (president had "dominant" role over daily operations and was individually liable).

Defendant Dorvilier has stated that he is the CEO of Harry's Nurses, and that he "oversee[s] the whole operation, make[s] sure that the service has been provided." Dorvilier Dep. at 9:10-15. Dorvilier operates the business himself. *Id*. at 12:7-10. Accordingly, because Harry's Nurses is liable for violations of the FLSA, and defendant Dorvilier was a corporate officer with operational control of the corporation, Dorvilier is jointly and severally  liable to plaintiff.


**IV. Plaintiff's Motion for Notice of Collective Action**

I turn to plaintiff's request for court-authorized notice informing potential plaintiffs of their opportunity to "opt-in"

to the present lawsuit. This motion derives from 216(b) of the FLSA, which provides a right of action to recover unpaid overtime compensation and liquidated damages from employers who violate the Act's overtime provisions. 29 U.S.C. 216(b). Section 216(b) provides, in relevant part:

> An action to recover [for unpaid overtime wages] may be maintained against any employer... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Thus, under the FLSA potential plaintiffs must 'opt in' to a collective action to be bound by the judgment. Moreover, only if plaintiffs 'opt in' will the statute of limitations on potential plaintiffs' claims be tolled. *Hoffmann v. Sbarro, Inc.*, 982 F.Supp. 249, 260 (S.D.N.Y. 1997).

"It is well settled that district courts have the discretionary power to authorize the sending of notice to potential class members in a collective action brought pursuant to 216(b) of the FLSA." *Id.* at 261; *see also Braunstein v. E. Photographic Lab., Inc.*, 600 F.2d 335, 336 (2d Cir. 1979). "Because trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement early, at the point of

- 26 -

the initial notice, rather than at some later time." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 171 (1989). Court authorized notice "comports with the broad remedial purpose of the [FLSA]." *See Braunstein v. Eastern Photographic Laboratories, Inc.*, 600 F.2d 335, 336 (2d Cir. 1978).

In order to receive authorization for class notice in an FLSA action, plaintiff must demonstrate that potential class members are "similarly situated" to plaintiff. *See* 29 U.S.C. § 216(b). The threshold for demonstrating that potential plaintiffs are similarly situated is "very low at the notice stage." *Lynch v. United Servs. Auto. Ass'n*, 491 F.Supp.2d 357, 368. (S.D.N.Y. 2007). Plaintiff can meet this burden "by making a modest factual showing sufficient to demonstrate that [she] and potential plaintiffs together were victims of a common policy or plan that violated the law."[9] *Hoffman*, 982 F.Supp at 261 (collecting cases). This first review is "merely a preliminary finding," and does not require a determination that the persons being notified are, in fact, similarly situated to the plaintiff. *Lynch*, 491 F.Supp.2d at 368. After discovery, the Court reviews the collective action certification more rigorously, at which point it may decertify the collective action if it determines that the

---

[9]Unlike Rule 23, section 216(b) of the FLSA requires no showing of numerosity, typicality, commonality, or representativeness. As a result, "the 'similarly situated' standard for certifying a 216(b) collective action is considerably more liberal than class certification under Rule 23." *Lynch*, 491 F.Supp.2d at 369.

- 27 -

plaintiffs are not similarly situated. *Dumitrescu v. Mr. Chow Enters.*, 2008 U.S. Dist. LEXIS 49881, at *11 (S.D.N.Y. 2008).

Plaintiff has made the modest factual showing needed to support a preliminary determination that there are others similarly situated who should be notified of their opportunity to join this suit as plaintiffs. First, plaintiff states that she worked in excess of forty hours a week without receiving one and one-half times her normal compensation in accordance with the FLSA's overtime rules. Gayle Aff. at ¶ 3. Second, plaintiff alleges that all field nurses are paid in the same manner as plaintiff. Gayle Aff. at ¶ 7. Third, Defendants admit that they treat all of their nurses as independent contractors, including plaintiff. Dorvilier Dep. at ¶ 33:12-16.[10] Plaintiff and Ms. Patricia Robinson ("Robinson"), who also worked as a nurse for defendants, have submitted affidavits stating their belief that other field nurses are unaware that defendants' classification of them as independent contractors is unlawful. Gayle Aff. at ¶ 8; Robinson Aff. at ¶ 8. If plaintiff has a viable FLSA claim against defendants as the result of their classification of her position, it is likely that there are other similarly situated employees who have similarly viable claims. *See Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 368 (S.D.N.Y. 2007)

---

[10]At any given moment, Harry's Nurses Registry may have up to five hundred nurses on its referral list.

- 28 -

(plaintiffs met their burden where they relied on their own pleading and declarations to show they were subject to certain practices at defendant's workplace and, to the best of their knowledge, their experience was shared by members of the proposed class).

I accordingly grant plaintiff's application to circulate a notice of pendency to other persons similarly situated to herself pursuant to 29 U.S.C. § 216(b). I find it is appropriate to do so at this stage, rather than awaiting the completion of discovery, because this will facilitate "the Act's broad remedial purpose and promot[e] efficient case management," *Hoffman*, 982 F.Supp. at 262, and will preserve the rights of potential plaintiffs whose rights might become time-barred during the discovery phase of this case. This is a preliminary determination that may be revised upon the completion of discovery.

Plaintiff requests that the class be defined as "all persons who have been employed by Harry's Nurse Registry and/or Harry Dorvilier as field or per diem nurses at any time since November 7, 2004." This definition is accepted for the purpose of authorizing notice.

Plaintiff seeks an order compelling production of a list of names, last known addresses, dates of employment, telephone numbers, and social security numbers of all nurses registered with defendants' registry since November 7, 2004 to facilitate

- 29 -

discovery of similarly situated persons. Courts often direct an employer defendant to disclose the names and addresses of similarly situated potential plaintiffs. *See Patton v. Thomson Corp.*, 364 F. Supp. 2d 263, 266 (E.D.N.Y. 2005); *Cano v. Four M Food Corp.*, 2009 U.S. Dist. LEXIS 7780, at *35 (E.D.N.Y. February 3, 2009); *Chowdhury v. Duane Reade, Inc.*, 2007 U.S. Dist. LEXIS 73853, at *6 (S.D.N.Y. October 2, 2007); *see also Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169-170; 107 L. Ed. 2d 480; 110 S. Ct. 482 (1989) (authorizing disclosure for the purposes of notice in an ADEA action).

Most of the information requested by plaintiff is essential to identifying and notifying potential "opt-in" plaintiffs, and should be disclosed. However, plaintiff has not made a showing that disclosure of confidential social security numbers is necessary in order to facilitate the delivery of notices. *See Chowdhury,* 2007 U.S. Dist. LEXIS 73853, at *21. The request for disclosure of social security numbers is denied without prejudice to its renewal after disclosure of the other information from defendants on a more ample showing of how the information is necessary to identify class members.

## CONCLUSION

For the reasons stated above, plaintiff's motion for partial summary judgment on the issue of liability is granted, and

- 30 -

defendants' motion for summary judgment is denied. In addition, plaintiff's motion seeking leave to circulate a notice of pendency pursuant to 29 U.S.C. § 216(b) is granted. Defendants are directed to disclose the names, last known addresses, dates of employment, and telephone numbers for all persons employed as field or per diem nurses from November 7, 2004 to the present on or before April 9, 2009. Plaintiff is directed to settle a proposed Notice of Pendency and consent form on or before the same date.

SO ORDERED.


Dated:     Brooklyn, New York
           March 9,  2009


                    By: /s/ Charles P. Sifton (electronically signed)
                         United States District Judge